Robert S. COOPER, Jr.,
Plaintiff-Appellant,

v.

The DEPARTMENT OF the NAVY OF
the UNITED STATES,
Defendant-Appellee.

No. 75–3100.

United States Court of Appeals,
Fifth Circuit.

Aug. 29, 1977.

Edward P. Sutherland, Baton Rouge, La., for plaintiff-appellant.

Douglas M. Gonzales, U. S. Atty., Baton Rouge, La., Thomas G. Wilson, Leonard Schaitman, App. Sec., Civ. Div., Dept. of Justice, Washington, D. C., for defendant-appellee.

Before WISDOM, GEE and FAY, Circuit Judges.

GEE, Circuit Judge:

About three years ago, a United States Marine Corps helicopter crashed into the Mediterranean Sea near Crete while on a routine training mission. Appellant Cooper, a licensed attorney, was retained by the family of one who died in that crash to investigate the prospects of a wrongful death action against the aircraft's maker. Mr. Cooper asked the Navy to give him the reports of its investigations of the crash. It gave him some information but not all he wanted, and he brought this suit under the Freedom of Information Act.[1] When he did so, the Navy invoked executive privilege and moved for summary judgment on grounds that Mr. Cooper had gotten all of the reports he was entitled to under the Act and that the remaining reports and portions of reports were exempt from disclosure under the Act's exemption 5. The district court agreed, this appeal followed, and we affirm in part and in part reverse.

### The Investigations

From affidavits filed by defendant it appears that in this case, as it does in that of all major accidents, the Navy conducted two separate categories of investigations, each with its different procedures and different aims. The primary investigations, in the nature of an inquest, are known as the Judge Advocate General's Manual Investigations and have as their purpose the factual documentation of all matters pertaining to the accident which may serve as a basis

---

1. 5 U.S.C. § 552 (as amended 1974).

for legal or administrative action. They are primarily concerned, therefore, with assessing property damage and unearthing possible negligence, neglect of duty, etc. They are independent of all other investigations. Witnesses are required to be warned of their statutory [2] and constitutional rights against involuntary self-incrimination. In investigations of the more serious class of incidents, a formal hearing is had, with sworn testimony.

The other investigation is called the Aircraft Accident Safety Investigation and is solely concerned with safety and the prevention of accidents. Unlike those for the JAG Manual Investigation, instructions for this investigation specify that witnesses are not to be sworn and will be assured that their testimony will not be used in any legal or punitive proceeding. Appeals are made to witnesses' concern for the safety of others, and personal opinions and speculation are invited. By such means, disclosures against interest are frequently obtained. An affidavit of the Secretary of the Navy, contained in the record, states that this investigation is a critical element of the flight-safety program, which over the twenty-year period preceding the accident in this case has reduced fatalities from 285 per year to 43 and accidents per 10,000 flying hours from five to less than one. It is, he states, Navy policy that the reports of these investigations are not available even to Navy claims officials or Navy lawyers defending actions against the United States: only to those concerned with flying safety. And his affidavit goes on to assert that if the confidentiality of the safety investigation cannot be maintained, then there is no purpose in continuing to hold it in addition to the JAG Manual Investigations.

■ Other affidavits assert that all *factual* matter in the JAG Manual Investigation has already been furnished Mr. Cooper and that there is no factual matter "of substance" in the report of the safety investigation (AAR) that has not already been furnished plaintiff from the JAG Manual Investigation report (JAGIR). Of necessity, these assertions are undisputed, since Mr. Cooper has had no opportunity to see either report. We have, however, examined the matter furnished Mr. Cooper, and it cannot be denied that this constitutes a mass of relevant material: the names, serial numbers and statements of numerous witnesses; flight schedules; audits of the pilots' flight experiences; medical reports; messages and dispatches in great number, including some containing opinions about the cause of the accident,[3] etc. In view of these disclosures, we cannot agree with appellant's assertions that the "only information available is in the hands of the Navy" or that his case is "paralyzed" by the Navy's non-disclosure. Though need is not a criterion for disclosure under the FOIA—if anyone can have the desired information everyone can [4]—it appears that insofar as need is concerned, the Navy has already furnished Mr. Cooper sufficient information for a very good start indeed on his discovery.

### The AAR

The parties have joined issue on the question whether exemption five of the FOIA applies to the AAR and the JAGIR so as to authorize non-disclosure of the former and only a partial disclosure of the latter. That section exempts from disclosure "Interagency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).

■ As the Supreme Court has noted, the purpose of this exemption is to protect the consultative functions of government by furthering open and frank discussion within and between agencies of proposed

---

2. 10 U.S.C. § 831 (1956).

3. One dispatch, for example, remarks "Conclusions premature but lacking evidence of material failure it looked like a classic case of vertigo."

4. *Environmental Protection Agency v. Mink,* 410 U.S. 73, 92, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973).

administrative action. *Environmental Protection Agency v. Mink,* 410 U.S. 73, 87, 93 S.Ct. 827, 35 L.Ed.2d 119, quoting Mr. Justice Reed's opinion in *Kaiser Aluminum & Chemical Corp. v. United States,* 157 F.Supp. 939, 141 Ct.Cl. 38 (1958). It seems plain, and the record bears out the notion, that in the circumstances of an aircraft accident investigation, assurances of confidentiality may be especially needed to obtain full disclosures. After all, something has gone wrong—perhaps gravely, even mortally wrong—under circumstances inherently dangerous. The machines and the procedures being employed are generally uniform and will be employed again tomorrow in the same manner unless altered. Is there something wrong with them generally? Or did the mishap (or catastrophe) occur because of a particular defect in a particular machine? Does a crew-chief believe (though not with enough confidence to swear to it) that a pilot was unwell or distracted on the occasion of a fatal flight? Does he recall that he forgot to secure some important assembly of the craft before the flight? To permit a breach of assurances of confidentiality given in order to obtain answers to such questions as these may perhaps provide access to more information in that particular case, but common sense tells us that it will likely also assure that in future cases such information will never see the light of day and will be of use to no one. Logic argues, then, that in such a circumstance as the Aircraft Accident Safety Investigation, where premises of confidentiality have been found helpful and perhaps essential to obtaining information upon which to base corrective action, those promises should be respected and the answers and speculations which they produce shielded from disclosure.

Nor is authority to the contrary. In the seminal case on executive privilege for such statements, *Machin v. Zuckert,* 114 U.S. App.D.C. 335, 316 F.2d 336 (1963), *cert. denied,* 375 U.S. 896, 84 S.Ct. 172, 11 L.Ed.2d 124 (1963), the court noted and held:

> We agree with the Government that when disclosure of investigative reports obtained in large part through promises of confidentiality would hamper the efficient operation of an important Government program and perhaps even, as the Secretary here claims, impair the national security by weakening a branch of the military, the reports should be considered privileged.

316 F.2d, at 339. That court, however, limited the privilege to disclosures by *private* (as distinguished from service) personnel, simply stating that the reasons advanced for non-disclosure did not apply to information obtained from service people, though the court "recognize[d] that there may be reasons not presently appearing to us why even this portion of the report should be immune from subpoena." 316 F.2d, at 340.

With respect, we are unable to follow the reasoning upon which this distinction rests. It is true that service personnel need not fear one consequence that may attend disclosures by a private person: suit against his employer, with its attendant unpleasantness for him. But service people are human, too: they fear disciplinary action, work and hope for promotion, possess loyalties and ties of friendship to people and organizations, dislike speculating to the derogation of others' reputations, especially those of the dead, etc. In short, they have a most gracious sufficiency of reasons for withholding derogatory information—if it is to reflect upon, or even be attributed to, them. Matters of good faith aside, we think ample basis exists for respecting assurances of confidence given them and that any attempted distinction between such assurances given them and those given private persons is not sound.

The language of the exemption itself affords no basis for any such distinction. Nor do the more recent cases appear to make any. In *Brockway v. Department of the Air Force,*[5] for example, a decision holding the Air Force equivalent of the AAR immune under Exemption 5 from disclosure, *Machin* is cited with approval and the above language is quoted. But while the distinc-

5. 518 F.2d 1184 (8th Cir. 1975).

tion drawn by *Machin* between disclosures of private and service personnel is noted, it does not appear to have been applied. We likewise decline to do so.

 Appellant offers several subsidiary arguments, all respectable but none dispositive, for disclosure of the AAR. He points to the general fact-deliberative matter distinction, urging that Exemption 5 is primarily intended to protect ideas and recommendations exchanged in the deliberative process and not factual material.[6] But the sort of factual material which the AAR may be expected to contain—adverse comments and speculations, obtained on promise of secrecy—is surely as vital to the deliberative process as any opinion, since to be of any use opinions must have something to be "about." He points to the admitted circumstance that this particular AAR contains no witnesses' statements as such. But whatever information of a factual nature is contained in it was obtained upon the same promises as actual statements would have been, and the distinction sought to be made is one of form only. Finally, Appellee argues that whatever privilege might exist for the AAR has been waived by a regulation providing that a copy of it is to be forwarded "to the Naval Plant Representative Office at the factory at which the aircraft was manufactured." Since the AAR is thus "routinely furnished to aircraft manufacturers," Appellant claims, it is entitled to no protection. But Appellant misapprehends the effect of the regulation; the personnel in the Representative Office are employees of the Navy, not of the manufacturer.[7] And though other regulations do permit a limited access to the AAR by manufacturer's technical representatives on a "need-to-know" basis,[8] it is the law of this circuit that such limited disclosures to proper outside persons as are necessary to carry

out effectively a purpose for assembling a governmental report in the first place do not waive its privilege. *Overby v. United States Fidelity & Guaranty Co.,* 224 F.2d 158 (5th Cir. 1955).[9] Doubtless a broadcast disclosure would be another matter, but we are unable to see reason in holding that a limited and proper use of the report for accident prevention purposes should work destruction of the confidentiality promised in assembling it and permit its use for the very purposes those whose disclosures made it possible were promised it would not be used for. Such a rule, where the AAR revealed possible defects in the aircraft as manufactured, would allow the Navy a Hobson's Choice between no *use* of the AAR or no AAR. Matters are not yet at such a stage.

 It may be objected that according, as we do, a general privilege to the AAR may in time promote the giving of broadcast and unnecessary assurances of confidentiality and cause the safety investigation to become primary, with the JAG Manual Investigation a mere charade. It has been observed, however,[10] and we agree, that there is judicial review of the reasonableness of any promise of confidentiality given by an agency. Nor is there much danger that the JAG Manual Investigation will atrophy; too many other procedures—disciplinary, compensatory, etc.—key into and commence from its factual findings.

As to the AAR, then, we find reason in the Navy's arguments that breaching its confidentiality would destroy or greatly diminish a highly effective safety program which has saved numerous lives and much government property. We are not disposed nor does the FOIA require that we decree

---

6. *See, e. g., Soucie v. David,* 145 U.S.App.D.C. 144, 448 F.2d 1067, 1077 n. 41 (1971), and cases there collected.

7. Indeed the regulation in question goes on to forbid sending the AAR to any plant where there is not a Naval Plant Representative Office. OPNAVINST 3750.6J, § 505(b)(1)(e).

8. *Id.* at § 902(g).

9. *Contra O'Keefe v. Boeing Co.,* 38 F.R.D. 329 (S.D.N.Y.1965).

10. *Brockway v. Dep't of the Air Force,* 518 F.2d, at 1188.

such consequences in the name of appellant's convenience.[11]

### The JAGIR

As we noted earlier, this report stands on a quite different footing than the AAR. It is the product of more formal procedures, it may incorporate sworn testimony, witnesses before it must be advised of their rights, etc. No considerations of confidentiality are involved in its production. The investigation which produces it is designated an "administrative fact-finding body," [12] whose primary function is defined as "to search out, develop, assemble, analyze, and record all available information relative to the matter under investigation" and to "formulate clearly expressed and consistent findings of fact." [13] These are to form the factual basis for various actions, such as evaluating and modifying operating procedures, improving and redesigning equipment, replying to legitimate public inquiries, disposing of claims and redressing property damage, and making personnel decisions. It is true that the Manual is careful to characterize the JAGIR as "purely advisory," not a final determination, and not binding on convening or reviewing authorities.[14] But other regulations speak of it as "conducted for the factual documentation of all factual matters . . . which can be used for any legal or administrative action," [15] and it is difficult to avoid the impression that its basic (as distinguished from ultimate) fact-findings are likely to be final in the usual case.

In a word, the basic thrust of the entire JAGIR project is fact-oriented: the uncovering and documenting of the facts of the accident. In this report, we view something like the mirror image of the memoranda we considered in *Wu v. National Endowment for Humanities*, 460 F.2d 1030 (1972). We characterized these as "recommendations [which] will usually contain some factual material but it is only incidental to their primary purpose, which is the expression of an opinion . . . ." 460 F.2d, at 1033. In the JAGIR, by contrast, establishing fact is the concern, any opinions found are incidental to this purpose, and no questions of confidentiality are present. It follows that the JAGIR will normally be subject to disclosure in toto, despite Exemption 5 of FOIA. Where, however, the Service in question seeks to withhold portions of such a report, the normal procedure will be for the district court to review the contested matter to determine whether any should be withheld in order to safeguard the consultative or decision-making process within or among the Services or their components. By contrast to the AAR, we do not believe the agency should have the almost-final say regarding disclosure of this fact-steeped report. Since we cannot determine from the record that this has been done here, we vacate the judgment below to this extent only and remand for such an *in camera* examination and judgment accordingly.

It is so

ORDERED.

---

11. And convenience is all that is involved here, since the Navy has supplied appellant with much factual information contained in the JAGIR.

12. Manual of the Judge Advocate General 0201(a)(2).

13. *Id.* at 0201(b)(1).

14. *Id.* at 0201(c).

15. OPNAVINST 3760.6J § 402(d).