**Annis Mae ASHLEY, et al., Plaintiffs,**

v.

**U.S. DEPARTMENT OF LABOR, Defendant.**

**Civ. A. No. 82–3233.**

United States District Court, District of Columbia.

Oct. 21, 1983.

902

L. Thomas Galloway, and J. Davitt McAteer, Washington, D.C., for plaintiffs Ashley et al.

Robert E.L. Eaton, Jr., Washington, D.C., for defendant.

## MEMORANDUM

FLANNERY, District Judge.

The plaintiffs in this case have filed an action under the Freedom of Information Act (FOIA) to compel the production of certain documents held by the United States Department of Labor Mine Safety and Health Administration (MSHA). Plaintiffs seek disclosure of all materials relating to MSHA safety investigations of several recent multiple-fatality mine disasters and MSHA reactions, if any, to these disasters. MSHA identified 21 responsive documents and disclosed eight in their entirety and parts of nine others, but argues that the remaining material is protected by the "deliberative process" privilege embodied in Exemption five of FOIA, 5 U.S.C. 552(b)(5). Plaintiff argues that, as a matter of law, the undisclosed material is not covered by Exemption five. This matter comes before the court on the parties' cross-motions for summary judgment. For the reasons stated herein, the court grants defendant's motion for summary judgment with regard to all disputed documents except document 19, which is ordered disclosed in part.

*Facts*

On May 10, 1982, plaintiffs made a FOIA request to MSHA for copies of "any memorandum or internal correspondence from any of the accident investigation teams to the Assistant Secretary or to the Coal Administrator [of MSHA] regarding any findings or suggestions growing out of the multiple-fatality accident investigations beginning with the Ferrell mine accident up to the present time," as well as "information as to whether any action has been undertaken by the agency as the result of these investigations." Pursuant to this request, MSHA identified 21 responsive documents, but refused to disclose all or parts of a majority of the documents. On November 10, 1982, after plaintiffs had exhausted all administrative remedies, they filed this FOIA action seeking disclosure of the still withheld material. Following initiation of this suit, MSHA disclosed all or parts of several additional documents, but the agency is still withholding all of the documents 9, 10, 19 and 21 and parts of documents 11–18 and 20.[1]

1. Documents 1–8 have been disclosed; the following documents are still being withheld in whole or in part:

(9) Memo on Recommendations, Explosion at Ferrell No. 17 Mine, December 30, 1980; and related personnel records. (entire text)
(10) Memo on Recommendations, Explosion at Ferrell No. 17 Mine, March 3, 1981; and related personnel records. (entire text)
(11) Memo on MSHA Activities at Mills Creek No. 5 Mine; Gray Knob Coal Co., May 25, 1982. (deleted sections)
(12) Memo on Roof Control Plan Approval Process for Reinau No. 2 Mine, Northern Coal Co., March 1, 1982. (deleted sections)

(13) Memo on MSHA Inspection Related to Dutch Creek No. 1 Mine, March 24, 1982. (deleted sections)
(14) Memo on Disaster Investigation No. 21 Mine; Grundy Mining Co., Inc., April 22, 1982. (deleted sections)
(15) Memo on MSHA Activities at RFH Coal Company's No. 1 Mine. (deleted sections)
(16) Memo on MSHA Activities at Adkins No. 11 Mine. (deleted sections)
(17) Memo on Roof Control Plan for Rice Harlan Mine, Alliance of Puckett Coal Co., Inc. (deleted sections)
(18) Report on Post Disaster Inspection Audit, Ferrell Mine Explosion, January 21, 1981. (deleted sections)

On February 16, 1983, MSHA submitted a detailed *Vaughn* affidavit setting forth the precise nature of the material withheld, the context within which the documents were generated, and the agency's reasons for non-disclosure. *See* Petters Affidavit. MSHA subsequently filed an additional affidavit describing in even greater detail the responsibilities and organizations of the MSHA Division of Safety and the Office of Technical Compliance and Investigations. *See* Lamonica Affidavit. All of the contested documents in this case were generated by Division of Safety or Office of Technical Compliance personnel in connection with an in-house self-evaluation and improvements program under the direction of Joseph A. Lamonica, Administrator for Coal. Consistent with MSHA's statutory responsibility continually to develop and enforce mine safety and health standards to reduce the incidence of mine accidents, the purpose of the program is to assist the agency in the ongoing process of reviewing and revising mine health and safety standards, inspector training programs, mine investigation procedures, and field office management practices.[2] After serious mine accidents, MSHA staffers connected with the self-evaluation and improvements program are dispatched to the accident site to "inspect the inspectors" in an effort to determine whether inadequate mine inspection procedures, inspector incompetence, or poorly devised safety standards contributed to the accident, and in order to pinpoint areas in need of improvement. The documents at issue in this case were prepared following such visits, and consist of reports or follow-up memoranda on the adequacy or inadequacy of various aspects of MSHA's program, at times accompanied with the writer's recommendations for improvement.

All of the disputed documents were written by agency subordinates without decision-making authority for use by their immediate superiors or more senior agency officials responsible for determining what changes, if any, should be made in MSHA regulations, practices, and procedures. The contents of each of the contested documents and the role each document allegedly played in the agency's deliberative process was discussed in detail in an affidavit prepared by Sofia P. Petters of the Department of Labor, and can be summarized as follows:

Documents 9 and 10, which have been withheld in full, contain the writer's opinions regarding the adequacy of safety investigations which were conducted at the Ferrell mine site. The writer makes several specific personnel and other more general recommendations for improvement of inspection staff performance. Both documents were written by the Chief of the Division of Safety to MSHA superiors, and were intended to aid in the development of programs and procedures to enhance inspection staff performance.

Documents 11–16 were disclosed in part; the deleted portions consist of the opinions of Safety Division investigators on a myriad of enforcement-related issues including the adequacy of actions taken by mine inspectors at multiple-fatality accident sites and whether those inspectors had received adequate training. These memoranda were submitted to the Chief of the Division of Safety to assist him in formulating specific recommendations to senior agency officials regarding what improvements in the enforcement program, if any, are needed.

(19) Reports on Post Disaster Inspection Audits: Adkins No. 11 Mine; Grundy No. 21 Mine; RFH No. 1 Mine; and Dutch Creek No. 1 Mine. (entire text)
(20) Memo on Multiple Fatalities, Plan Approvals and Quality of Inspection. (deleted sections)
(21) Memo on Training of Inspectors. (entire text)

**2.** The purpose of the self-evaluation and improvements program is *not* to conduct primary accident investigations to determine the physical causes of mining accidents—that task is performed by MSHA inspectors pursuant to 30 U.S.C. § 813(a). Such primary investigations were conducted for each multiple-fatality accident since the Ferrell accident in 1980, and the results have been published and are available to the public, *see* Plaintiffs' Statement of Material Facts, # 3.

Document 17 is a one page memorandum from a Safety Division staff member to the Division chief concerning the roof control plan at a mine which had recently experienced a serious accident. The deleted portions consist of the author's opinions regarding the efficacy of the company's roof control plan and MSHA's review and enforcement of that plan. Like documents 11—16, document 17 was submitted to the Safety Division chief for his use in making recommendations to agency superiors, in this case regarding the need for MSHA changes in its procedures for review and enforcement of roof control plans.

Document 18, which was withheld in part, discusses a post-disaster inspection audit of selected MSHA field offices. The purpose of the audit was to "determine whether existing inspection policies and procedures sufficiently address MSHA's enforcement responsibilities, and to what extent those policies and procedures were being followed by MSHA inspection personnel." The memorandum at issue was written by an official from the Office of Technical Compliance and Investigations to the head of the self-evaluation and improvements program to assist him in determining what changes, if any, were needed in inspector hiring and training and use of agency enforcement resources. The deleted portions consist of the writer's opinions regarding deficiencies in these areas, as well as the writer's recommendations regarding the assignment of mine inspectors and other administrative matters.

Document 19 is a 116 page compilation of two to four page reports prepared by Office of Technical Compliance and Investigations personnel, entitled "Compliance and Efficiency Surveys in the Field Offices of Districts 6 and 7." The document was withheld in its entirety. Each two to four page report discusses a discrete subject or problem in the areas of MSHA inspection and enforcement, and is written on an agency form. The forms contain an "observation" section, a "reference and recommendations" section, which contains recommendations by the field inspectors interviewed by the report author, and a "com-

ments" section, which contains the author's personal recommendations for an appropriate administrative response, if any, to the issue discussed in the report. The reports making up document 19 are reviewed on a periodic basis by the head of the Office of Technical Compliance and Investigations, and they provide him with information which may form the basis for any recommendations he chooses to make to superior agency policy makers regarding the need for revisions in MSHA enforcement procedures or standards.

Document 20, a five page memorandum captioned "Multiple Fatalities, Plan Approvals and Quality of Inspections," was prepared by the chief of the Division of Safety based on his review of documents 11–17, and is addressed to the director of the self-evaluation and improvements program, Mr. Lamonica, for his use in ongoing efforts to improve the MSHA enforcement program. Parts of the document were disclosed; the deleted portions consist of the author's conclusions as to which of the enforcement problems revealed through post-accident investigations are most important, as well as the author's recommendations regarding specific changes that should be made to enhance MSHA's enforcement program.

Document 21, which has been withheld in its entirety, is a four page memorandum entitled "Training", which was written by the Safety Division chief to Mr. Lamonica. It contains the author's assessment of MSHA's inspector training program and makes several recommendations, gleaned in part from documents 9 and 10, for the improvement of the program.

*Discussion*

A. *General Standards for De Novo Review*

Several general principles guide the court in its review of MSHA's claim that the disputed documents are exempt from disclosure under 5 U.S.C. § 552(b)(5), the "deliberative process" exemption. First, the agency has the burden of justifying non-disclosure by establishing the applica-

bility of the claimed exemption to each document or portion thereof that is withheld, and its burden is a heavy one when the deliberative process privilege is claimed, as here, with respect to documents that were not part of a clearly defined process leading to a specific decision, *Coastal States Gas Corp. v. Department of Energy,* 617 F.2d 854, 868 (D.C.Cir. 1980); *Vaughn v. Rosen (Vaughn II),* 523 F.2d 1136, 1146 (D.C.Cir.1975).

 Second, the agency must sustain its burden of proof through submission of detailed affidavits which identify the documents at issue and why they fall under the claimed exemption, *Vaughn v. Rosen (Vaughn I),* 484 F.2d 820, 826–28 (D.C.Cir. 1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974); *accord, Hayden v. National Security Agency,* 608 F.2d 1381, 1387 (D.C.Cir.1979), *cert. denied,* 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980). The court must conduct a *de novo* review of the agency's exemption claims, but generally should not do so on the basis of *in camera* review of the disputed documents; it should do so on the basis of the agency's affidavits, *Hayden,* 608 F.2d at 1387; *Lead Industries Association v. OSHA,* 610 F.2d 70, 87 (2 Cir.1979); *Mead Data Central, Inc. v. United States Department of the Air Force,* 566 F.2d 242, 260 (D.C.Cir.1977). If the affidavits are specific, clear, and reasonably detailed, and there is no evidence in the record contradicting them or demonstrating agency bad faith, then the court need not question the veracity of the affidavits and must accord them substantial weight in its decision, *Brinton v. Department of State,* 636 F.2d 600, 606 (D.C.Cir.1980), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405 (1981); *Hayden,* 608 F.2d at 1387.[3]

Finally, the court may grant summary judgment only if it is satisfied that the moving party has proven that no substantial and material facts are in dispute and that it is entitled to judgment as a matter of law, *McGehee v. CIA,* 697 F.2d 1095, 1100 (D.C.Cir.1983); *Weisberg v. United States Department of Justice,* 627 F.2d 365, 368 (D.C.Cir.1980).

Both parties to this suit have asserted that there are no substantial and material facts in dispute, although plaintiffs have characterized some of the disputed documents in a way which is inconsistent with the description of the documents contained in MSHA's affidavits.[4] As noted above, MSHA has submitted affidavits which clearly and specifically identify the documents at issue, the context within which they were generated, and its grounds for non-disclosure. Because plaintiffs have not alleged or proven agency bad faith or introduced evidence which contradicts the validity of the agency's affidavits, the court need not question the veracity of the affidavits and accepts the agency's description of the documents at issue and their context, *Brinton,* 636 F.2d at 606; *Hayden,* 608 F.2d 1387. The court therefore adopts the description of the documents at issue contained in the agency's affidavits, and finds that there are no substantial or material issues of fact in dispute. This action may therefore be disposed of by summary judgment.

**B.** *The Deliberative Process Privilege*

 Although the basic policy of FOIA is to promote the disclosure of government documents, Congress enacted a number of exemptions from the otherwise mandatory requirements in order to protect legitimate governmental interests. Exemption 5, which MHSA asserts as the basis for withholding the documents at issue, exempts from disclosure "inter-agency or intra-

---

**3.** Neither the mere allegation of agency misrepresentation or bad faith nor evidence of agency misconduct in other unrelated cases should undermine the sufficiency or credibility of affidavits that meet the requirements outlined, *Hayden,* 608 F.2d at 1387.

**4.** MSHA objects to plaintiffs' characterization of the documents in Plaintiffs' Statement of Material Facts, # 7–8. Plaintiffs argue throughout that the disputed documents are primarily retrospective analyses of final agency actions, a characterization which is at odds with MSHA's affidavits.

agency memorandums or letters which would not be available by law to a party ... in litigation with the agency," 5 U.S.C. § 552(b)(5). It is well established that Exemption 5 incorporates the governmental privilege, originally developed in discovery cases, to protect documents "containing advisory opinions and recommendations, or reflecting deliberations comprising the process by which government policy is formulated," *Mead Data*, 566 F.2d at 242, *see, e.g., NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975); *ITT World Communications, Inc. v. FCC*, 699 F.2d 1219, 1233 (D.C.Cir.1983). In adopting this "deliberative process" privilege, Congress recognized that full and frank exchange of ideas, recommendations, and personal opinions between agency personnel would be inhibited if agencies were forced to operate in a fishbowl. Congress feared that the quality of agency decision-making and decisions would be seriously undermined under such circumstances, *Sears*, 421 U.S. at 150–51, 95 S.Ct. at 1516–1517; *Coastal States*, 617 F.2d at 866. In addition, the Court of Appeals for the District of Columbia Circuit has recognized that Exemption 5 protects documents which would "inaccurately reflect ... the views of the agency, suggesting as agency policy that which is as yet only personal opinion" in order to "protect against confusing the issues and misleading the public," *Coastal States*, 617 F.2d at 866.

To demonstrate that withheld material is protected by the deliberative process privilege, the agency must show that the document was "pre-decisional"—*i.e.*, generated *before* the adoption of agency policy on the issue it discusses; that the deleted material was "deliberative"—*i.e.*, reflective of the give-and-take of the consultative process, *see Coastal States*, 617 F.2d at 866; and that it contains no factual material which is reasonably segregable and may be disclosed without revealing the agency's deliberative processes, *see EPA v. Mink*, 410 U.S. 73, 88–90, 93 S.Ct. 827, 836–837, 35

L.Ed.2d 119 (1973).[5] Plaintiffs in this case argue that the contested documents are neither pre-decisional nor deliberative, but that they are primarily investigative reports which reflect the agency's final objective analysis of past agency performance. Plaintiffs contend that documents, such as those withheld here, which were generated as part of an ongoing, nebulous process of agency self-evaluation cannot be considered pre-decisional since there is no specific agency decision they were intended to support. Such documents, plaintiffs assert, do not reflect the agency's deliberative process because they are essentially retrospective, final reports which are often simply filed away for possible future reference. Plaintiffs rely heavily on *Vaughn v. Rosen (Vaughn II)*, 523 F.2d 1136 (D.C.Cir. 1975), contending that *Vaughn II* requires disclosure of all documents which "primarily investigate and evaluate the past performance of agency personnel," and that such documents are not insulated from disclosure merely because the agency claims they were developed for the sake of future agency improvements.

Plaintiffs interpret *Vaughn II* much too expansively, and ignore recent precedent. *Vaughn II* simply does not hold that *all* documents which evaluate past agency practices as part of a self-improvements program must be disclosed; it merely holds that the agency must carry a heavy burden of demonstrating that such documents play a role in the deliberative process, and that to meet that burden the agency must provide a detailed description of how *each* document contributes to that process, *Vaughn II*, 523 F.2d at 1143–44. In *Vaughn II*, the government made no effort to demonstrate what portions of the contested documents were evaluative, and also failed to demonstrate how the contested document, a special, independent commission report on the personnel practices of federal agencies, would be used by specific agencies to make future decisions on personnel practices, *id.*[6]

---

**5.** The segregability issues presented in this case are discussed in Part C, *infra*.

**6.** Despite the government's failure to provide detailed affidavits in *Vaughn* necessary to show

By contrast, in the case at bar MSHA has described each contested document in detail, and has disclosed what it determined to be non-protected portions of most of the documents. Most importantly, with respect to each document, MSHA has spelled out in detail the precise context within which it was generated and what role in the deliberative process it plays. The documents were all generated pursuant to an established self-evaluation and improvements program designed to enhance MSHA enforcement efforts. They were all written by agency personnel who had no decisionmaking authority, and were addressed to agency superiors to help them formulate general or specific policies. The types of decisions each document was intended to support were described in detail in MSHA's affidavits.

Further, contrary to plaintiff's assertion, the courts have *not* required that documents which are not part of a clear process leading up to an assured final decision be disclosed in all cases, as long as the agency can demonstrate that the documents are part of *some* deliberative process, *see Coastal States*, 617 F.2d at 868; *Vaughn II*, 523 F.2d at 1146. In fact, the Supreme Court has clearly stated that

> [our] emphasis on the need to protect *pre-decisional* documents does not mean that the existence of the privilege turns on the ability of the agency to identify a specific decision in connection with which a memorandum is prepared.

*Sears*, 421 U.S. at 151 n. 18, 95 S.Ct. at 1517 n. 18 (emphasis in original).

■ Decisions in the District of Columbia Circuit have established that even if a disputed document is several years old when a FOIA suit is initiated and the document has not yet produced a final decision, there are circumstances in which disclosure would still impede the decisionmaking process and therefore not be required, *Brinton*, 636 F.2d at 605. Similarly, an agency's rejection of the recommendations in a withheld document, either explicitly or implicitly through agency inaction, does not make otherwise predecisional documents final and disclosable, *Common Cause v. Internal Revenue Service*, 646 F.2d 656, 659 (D.C.Cir.1981); *Brinton*, 636 F.2d at 600; *Lead Industries*, 610 F.2d at 84.

■ Plaintiffs contend that because many of the disputed documents evaluate *past* agency actions, they cannot be *pre*-decisional. The District of Columbia Circuit recently held, however, that "discussion of the merits of past efforts, alternatives currently available, and recommendations as to future strategy" are privileged if the documents bear sufficient indicia that they were part of the deliberative process, *ITT World Comm.*, 699 F.2d at 1237. The documents at issue here bear all of the indicia of pre-decisional documents identified in prior cases—they were all written by subordinates to superiors, *see Coastal States*, 617 F.2d 868; the authors had no decisionmaking authority, *see Taxation With Representation Fund v. Internal Revenue Service*, 646 F.2d 666, 679 (D.C. Cir.1981); and the opinions expressed therein did not explain agency policy or *establish* agency guidelines or "secret law", *see Jordan v. United States Department of Justice*, 591 F.2d 753, 774 (D.C.Cir. 1978). Instead, the documents at issue, which evaluate and criticize past agency action, are intended to contribute to the process of *changing* agency procedures. In *Sears*, the Supreme Court, after stating that documents may be predecisional even

how the document at issue was part of the deliberative process, the District Court held that easily severable portions of the documents labelled "recommendations" or "action items" were properly withheld, *Vaughn v. Rosen*, 383 F.Supp. 1049, 1054 (D.D.C.1974). That portion of the District Court's order was not appealed. Even in the *Vaughn* case, then, the court recognized that certain material such as "recommendations", is so obviously intended to be part of the deliberative process that no specific description of that process is necessary to justify nondisclosure. Much of the material at issue in this case is, as MSHA's affidavits make clear, recommendatory material. Hence even if MSHA had not done such a thorough job of describing how this material contributed to the deliberative process, disclosure would not be mandated by *Vaughn*.

if they do not support a specific and identifiable decision, stressed the importance of protecting the agency self-evaluation process:

> Agencies are, and properly should be, engaged in a continuing process of examining their policies; this process will generate memoranda containing recommendations which do not ripen into agency decisions; and the lower courts should be wary of interfering with this process.

*Sears*, 421 U.S. at 151 n. 18, 95 S.Ct. at 1517 n. 18. Documents generated pursuant to agency self-evaluation and improvement programs similar to MSHA's program have been held protected by the deliberative process privilege, especially when the purpose of the program was to investigate accidents to prevent their reoccurrence and to improve agency safety promotion procedures, *see Cooper v. Department of the Navy*, 558 F.2d 274 (5th Cir.1977) (documents generated during aircraft accident investigation conducted as part of Navy safety program held exempt); *Brockway v. Department of Air Force*, 518 F.2d 1184 (8th Cir.1975) (Air Force post-accident safety investigation documents exempt). In both *Cooper* and *Brockway*, the agency's safety investigations were conducted not to assist decisionmakers in making a final, specific decision, but to improve general agency accident prevention procedures. The *Cooper* and *Brockway* courts held that disclosure of the sensitive evaluations, opinions, and criticisms contained in the accident reports would stifle frank expression to the detriment of the safety program and its ultimate aim of preventing accidents.[7] The same is true here.

██ Given the foregoing discussion of applicable precedent, the court finds that each of the documents at issue in this case falls within the protection of Exemption 5. Without exception, the documents were generated pursuant to a well established MSHA program designed to improve the enforcement of mine safety laws and regulations. They were all written by agency personnel without decisionmaking authority, and were directed to superiors to assist in the location of problem areas and the development of properly tailored program improvements. They contain the personal opinions, evaluations, or recommendations of agency staff, information which can be utilized or ignored by agency decisionmakers. None of the documents contain MSHA's official view on any issue. MSHA's affidavits describe in detail how each document was or may be utilized and how it fits into the agency's deliberative process. Disclosure of these documents would clearly impede the frank criticism of MSHA enforcement procedures necessary to pinpoint problem areas after major accidents so that preventive changes can be made. Further, public disclosure of low level evaluations and recommendations might mislead the public as to agency policy, and might create counterproductive pressure on superior decisionmakers to adopt unwise or untested recommendations. Sensitive post-disaster evaluations of agency policy designed to improve future enforcement procedures and prevent future accidents are exactly the kind of documents that need to be protected if MSHA's potentially beneficial self-evaluation and improvement program is to be effective. This court may not interfere in the operation of that program by requiring disclosure of the documents at issue, *Sears*, 421 U.S. at 151 n. 18, 95 S.Ct. at 1517 n. 18.

---

**7.** In both *Cooper* and *Brockway,* the documents at issue were generated pursuant to a post-accident safety investigation, not the primary accident investigation conducted to determine the cause of the accident. Both the *Cooper* and *Brockway* courts stressed that raw data on the physical causes and circumstances of the accidents investigated was available to the public from the primary accident investigation, which made withholding of documents generated pursuant to the supplemental safety investigation more acceptable, *Cooper,* 558 F.2d at 276; *Brockway,* 518 F.2d at 185–86. Similarly, in this case MSHA conducted a primary accident investigation of each multiple-fatality mine disaster, and the results are available to the public. The documents at issue were generated pursuant to a supplemental investigation for the purpose of agency self-evaluation and improvement in mine safety enforcement procedures.

## C. Segregability of Factual Material

■ Although MSHA has met its burden of demonstrating that the *documents* at issue fall within the deliberative process exemption, the agency must further demonstrate that the withheld documents contain no reasonably segregable factual material, which must be disclosed unless to do so would compromise the private remainder of the documents, *EPA v. Mink*, 410 U.S. 73, 88–91, 93 S.Ct. 827, 836–838, 35 L.Ed.2d 119 (1973); *Soucie v. David*, 448 F.2d 1067, 1077–78 (D.C.Cir.1971); *see also Montrose Chemical Corp. of California v. Train*, 491 F.2d 63, 67–71 (D.C.Cir.1974). For purposes of this segregability requirement, the District of Columbia Circuit has drawn a rough distinction between documents which are primarily evaluative, analytical or recommendatory, from which factual material need not be disclosed if it is inextricably intertwined, *Brinton*, 636 F.2d at 606; *see also Cooper*, 558 F.2d at 278; *Brockway*, 518 F.2d at 1192–93, and documents which are "subjective" only because the author has chosen which facts are important or which issues to highlight. All factual material in documents of the latter variety must be disclosed unless the agency can demonstrate that the document supports a specific, identifiable decision, that revelation of the factual material would reveal aspects of the agency's decisionmaking process, and that the factual material at issue is available to the public in some other, albeit less convenient, form, *ITT World Comm.*, 699 F.2d at 1239; *Playboy Enterprises, Inc. v. Department of Justice*, 677 F.2d 931, 935 (D.C.Cir.1982); *Cf. Montrose*, 491 F.2d at 68.

■ The court need not always review the disputed documents *in camera* to determine if the agency has properly segregated and disclosed all factual material. Here such review is unnecessary since the agency's affidavits are clear and detailed, and the agency has already demonstrated its good faith by attempting to segregate non-exempt material from most of the documents at issue, disclosing portions of documents 11–18 and 20. The withheld portions of documents 11–18 and 20, as described in the agency's affidavits, are comprised of the personal opinions, evaluations, or recommendations of non-decision-making officials. The court finds that *in camera* review of documents 11–18 and 20 is unnecessary, and holds that the agency has properly segregated factual material from these documents since the affidavits establish that portions have already been disclosed and, as discussed above, the material still withheld has been shown to fall under the protection of the deliberative process privilege, *see Lead Industries*, 610 F.2d at 70, *Weissman v. CIA*, 565 F.2d 692, 698 (D.C.Cir.1977).

The agency did not disclose any of documents 9, 10, 19 or 21. Again, the court finds that *in camera* review of these documents is unnecessary to determine if they contain any segregable factual material. The agency must carry its burden of demonstrating that they have not withheld segregable factual material by submission of affidavits, and if the *affidavits* fail to satisfy the agency's burden, then the court is not required to undertake lengthy *in camera* review to make appropriate segregation decisions. *In camera* review should not act as a substitute for the agency's responsibility to justify nondisclosure of allegedly factual material, and the court may order disclosure of all material that appears from the affidavits to be factual and reasonably segregable, *Mead Data*, 566 F.2d at 260.

Proceeding on this basis, the court finds that there is no reasonably segregable material which must be disclosed from documents 9, 10, or 21, but that portions of document 19 must be disclosed. Documents 9 and 10 discuss inspection staff performance at the Ferrell mine site and make specific personnel and other recommendations for the improvement of staff performance. MSHA affidavits establish that these documents consist almost entirely of evaluations and recommendations, and MSHA asserts that the factual material contained therein is inextricably intertwined with the sensitive parts of the docu-

ment, which the court has determined to be privileged. The court finds that MSHA has established the impossibility of segregating factual information from privileged opinion in these documents in a manner which would not compromise the privileged portions since MSHA's affidavits show that the documents consist primarily of privileged opinion. The need to ensure that there be a free flow of adverse comments after an accident which might have been due to inspector error—even if those comments contain some factual information—has been recognized as a legitimate basis for non-disclosure of such comments in a context almost identical to this case, *see Cooper*, 558 F.2d at 278; *Brockway*, 518 F.2d at 1193.

The same considerations apply to document 21, which was prepared with the help of the comments contained in documents 9 and 10. Document 21 contains the author's critical assessment of MSHA's inspector training program, and concludes with several recommendations for improvement. MSHA's affidavits establish that the document is entirely evaluative and recommendatory, and the court holds that MSHA has met its burden of demonstrating that it contains no reasonably segregable factual material which could be disclosed without revealing privileged information.

Document 19, however, falls into a different category, and from MSHA's own description contains material which is reasonably, and easily, segregable. The document, which has been withheld in full, is a 116 page compilation of two to four reports, written on agency-provided forms.[8] Each form discusses a discrete subject or problem regarding MSHA inspection or enforcement efforts, and many of the subjects are fairly technical. The top half of the first page of each form contains a series of boxes, to be filled in by the author with personal identifying information (name of author, names of officials interviewed, etc.). In addition, the form has

three other boxes entitled "Date", "Office and Activity Surveyed," and "Observation." Although the balance of each report form contains spaces for the author's candid, unofficial criticisms, comments and recommendations—and is properly withheld for the reasons discussed above—it appears that information in the "Date", "Office and Activity Surveyed," and "Observation" sections is easily segregable factual material.

MSHA has styled the "Observation" section as the "author's opinion regarding the existence of a problem and the nature of the alleged problem." Although all observations are concededly infused with the observer's subjective perceptions, the court does not believe that this changes "observations" to "opinions" in all contexts. The court finds it unlikely that short field "reports" contain no factual information, especially when a separate section is provided on a form for "observations", and is followed by subsequent sections for comments and recommendations. While the inspectors who filed these reports may have chosen to report only observations which they considered noteworthy—because indicative of a possible problem or an especially commendable situation—such agency staff selection and weighing of certain information from a larger pool does *not turn selected observations into protected "opinions"*. This is especially true when factual information is being compiled for general future use, as here, instead of for use in arriving at a specific final decision, *see ITT World Comm.*, 699 F.2d 1239. In short, because of the structure of the agency's report form and other contextual evidence, the court is not persuaded by the agency's assertion that information in the sections entitled "Observation" is not factual, but representative of the author's opinions. The agency having failed to carry its burden of demonstrating that it has disclosed all reasonably segregable factual material from document 19, the "Date", "Office and Activity Surveyed,"

---

**8.** A sample of the agency form used for these reports is attached to the Petters affidavit as

Exhibit E.

and "Observation" sections of each report therein must be disclosed. Disclosure of the information contained in these sections will be quite simple because the natural divisions provided by the agency's forms will eliminate the problem of trying to pluck out factual material from protected material, a problem presented in some cases involving divisionless memoranda containing intertwined factual material.

To summarize, the court holds that MSHA has demonstrated that the disputed documents are privileged under FOIA Exemption 5, and that the agency has segregated and disclosed factual material as required with respect to all disputed documents except document 19. The defendant's motion for summary judgment is therefore granted with regard to all documents except for document 19, which is ordered disclosed in part.